a.   Included in the report's list of "Past Achievements" was surveillance involving "military technology," which named an identified U.S. defense contractor and claimed that the entity had controlled one of the company's FTP (or File Transfer Protocol) servers and obtained 20G, or gigabytes, of technology information from it.  The report also identified a U.S. developed unmanned aerial vehicle ("UAV") and claimed that the entity had "acquired a list of targeted contractors and suppliers of that project and conducted reconnaissance of the targeted network structure.  We have collected a large amount of information and mailboxes of the targeted relevant personnel.  We have also obtained the password for the customer management system of the supplier [Identified U.S. Company] and controlled the customer information of that company."  The report also claimed that "[t]hrough long-term reconnaissance and penetration, [we have] secured the authority to control the website of the . . . missile developed jointly by India and Russia and that they would "await the opportunity to conduct internal penetration."

      b.   Other "Past Achievements" listed were obtaining military technology in Taiwan and files held by various groups within China, including the "Democracy Movement," and the "Tibetan Independence Movement."  The report concluded by noting

that it would keep "military technology intelligence as a main focus," among other targets.

20. On February 21, 2013, UC1 sent an e-mail with a document attachment to UC2. The e-mail attachment provided additional detail on the activities and methodologies of a specific entity in the PRC. Specifically, the report revealed that[1]:

> (1) . . .
>
> First, we use the surveillance means which combines espionage work and technology(s) to accommodate the demands of S&T [likely Science and Technology] development. . . .
>
> Second, we have gradually established technology bases outside China for the sake of security/safety and stability. So far, jump servers [likely hop points] have been set up in the U.S., Korea, Singapore and etc. The rotations/switches/changes are made on them irregularly based on the security/safety variations of the environment.
>
> Third, machine rooms are set up in the surrounding areas/regions for work convenience. Our machine rooms have been set up in Hong Kong and Macao respectively with legal status. . . .
>
> Fourth, in order to avoid diplomatic and legal complications, surveillance work and intelligence collection are done outside China. The collected intelligence will be sent first by an intelligence officer via a pre-ordered temporary server placed outside China or via a jump server which is placed in a third country before it finally gets to the surrounding regions/areas or a work station located in Hong

---

[1] My interpretations of certain terms are indicated in brackets.

> Kong or Macao. The intelligence is always picked up and transferred to China in person. . . .
>
> . . .
>
> (3) . . . The focus on the U.S. is primarily on the military technologies but it also touches other areas whereas the focus on Taiwan is mainly on the military maneuvers and military construction. So far, we still have control on American companies like [identifying U.S. companies] and etc. and the focus is mainly on those American enterprises which belong to the top 50 arms companies in the world.
>
> (4) In recent years, we, with relentless work and through multiple channels, have obtains respectively a series of military industrial technology data including F-35, C-17, [additional identified U.S. military technologies] as well as the Taiwanese military maneuvers, warfare operation plans, strategic targets, espionage activities and so forth.

21. On February 27, 2012, UC1 sent an e-mail with an attachment to UC2. The subject of the e-mail was "Complete Listing" and the attachment listed 32 United States military projects and data amounts associated with each project. For example, next to "F-22," the table listed "220M," which I believe indicates that 220 megabytes of data had been stolen regarding the F-22. Many of the other thirty-one projects listed amounts of data followed by a "G," which I believe refers to gigabytes of data, including one project that listed "57G" next to it. Based on my training, experience, and a review of those e-mails, I believe the attachment was a list of

compromised projects and the amounts of exfiltrated data claimed to have been obtained by UC1, UC2, and others with whom they work.

22. For several of the projects listed in this chart I have seen additional correspondence exchanged between SU, UC1, and UC2, which includes corroborating material supporting the claim that these projects were compromised. This corroborating information includes file directory listings, technical schematics, and proprietary documents of the victim companies.

23. FBI Special Agents, including myself, have compared many of the exfiltrated technical documents and excerpts exchanged between SU, UC1, and UC2, to originals obtained directly from U.S. companies or U.S. government entities, as set forth below. Because many of the military projects compromised by SU, UC1, and UC2 involved multiple defense contractors and subcontractors, the specific locations and companies from which many of the documents were obtained remains under investigation. With respect to the compromise of C-17 data, however, as discussed below, UC1 sent UC2 a report stating they had stolen the C-17 data from Boeing directly, and describing the intrusion that acquired the C-17 data. Likewise, e-mails between SU and UC1 in January 2010 contain at least one lengthy C-17 directory file listing that matches in extensive detail the files and folders hosted on Boeing's computer systems. These facts show

that the C-17 data was exfiltrated directly from Boeing's computer systems.

**E.   SU's Relationship with UC1 and UC2**

24.   SU's relationship with UC1 and UC2 appears to have begun in the summer of 2009.  At that time SU began sending a series of e-mails to UC1 and UC2 that--based on their content and my training and experience--appear to be targeting instructions for companies that SU recommended UC1 and UC2 evaluate for computer intrusions.

    a.   On August 5, 2009, SU sent an e-mail with an attachment from his stephensubin@gmail.com account to UC1.  The subject of the e-mail was "2008 Aerospace Industries arranged listing" and the attachment listed multiple U.S. and foreign companies in a "[p]erformance ranking," including one company in China.

    b.   On August 6, 2009, SU sent an e-mail with an attachment from his subin@lode-tech.com account to UC1.  The subject of the e-mail was "My cell phone number."  At the bottom of the e-mail was SU's signature block including his mobile telephone number.  Using this number as a password I was able to open the password-protected file attached to the e-mail.  The attachment was an excel spreadsheet listing the e-mail addresses, telephone contact information, and program roles for 80 engineers and program personnel working on a military

- 19 -

development project.  The individuals listed on the contact sheet included employees of U.S. companies and a branch of the U.S. armed services.  The metadata of the document indicated the document was originally created at an identified U.S. company.

    c.  Approximately two and a half years after receiving this project contact sheet from SU, UC1 included the associated military project to which it relates in the list of compromised projects that he sent to UC2 on February 27, 2012 (see paragraph 21).  The relevant entry read "57G" next to that project.  Based on these e-mails and other similar exchanges set forth herein, I believe this sequence of events shows that SU directed UC1 on whom and what to target, and UC1 later claimed to have successfully exfiltrated data from that target.

    d.  Further showing that SU provided targeting instructions to UC1 and UC2, SU sent UC1 additional e-mails from his subin@lode-tech.com account.  One e-mail was sent on December 14, 2009, with a subject line of "Target," which I believe was the purpose of the e-mail--to identify a target for UC1 to compromise.  The attachment to the e-mail listed the names and positions of four individuals--including the President and Vice Presidents for Electronic Systems Division, Electronic Manufacturing Division, and Program Management, as well as the website and telephone number for a company that develops

military electronic systems, including weapons control and electronic warfare systems.

  e. On December 17, 2009, SU sent another e-mail to UC1 with a subject line of "RE: Target." In that e-mail, SU identified other companies and e-mail accounts that were important, including the website, names, and e-mail addresses for four people at a European company that develops military navigation, guidance, and control systems. This second e-mail was carbon copied to one of UC2's e-mail addresses, demonstrating SU was in contact with both UC1 and UC2 at that time.

  f. Based on a review of numerous e-mails collected in this investigation, SU and UC2 were in fact in contact with each other as early as September 4, 2009, when SU sent an e-mail to both UC1 and UC2, advising them that Boeing would be sharing space with Lode-Tech at the Beijing Aviation Expo. These e-mails demonstrate: (1) that SU was in contact with both UC1 and UC2 by September 2009; and (2) that SU was simultaneously communicating with UC1 and UC2 about targets of exfiltration. Based on the nature of their communications, I believe UC1, UC2, and SU were all participating in the conspiracy in 2009.

  F. **Exfiltration of C-17 Data**

  25. On August 13, 2012, UC1 sent an e-mail with an attachment to UC2. The subject of the e-mail was "C-17." The

attachment was a report titled "C-17 work summary." The report claimed that there had been a successful exfiltration of C-17-related data from Boeing. The report indicated that UC1, UC2, and a third individual were responsible for the implementation of the project. The report also referenced an attached "Sample File" and attached "Directory File" but those files were not attached to the e-mail. The report stated as follows:

> . . . In 2009, . . . [we] began reconnaissance of C-17 strategic transport aircraft, manufactured by the American Boeing Company and code named "Globemaster." . . . [W]e safely, smoothly accomplished the entrusted mission in one year, making important contributions to our national defense scientific research development and receiving unanimous favorable comments . . . .
>
> . . . The development of C-17 strategic transport aircraft is one of the most time-consuming projects in the American history of aviation research and manufacture: a total of 14 years from 1981 when the McDonnell Douglas Company won the development contract to 1995 when all test flights were completed. In development expenses, it is the third most expensive military aircraft in American history, costing $3.4 billion (U.S.) in research and development . . . .
>
> Thorough planning, meticulous preparations, seizing opportunity . . . , [we] initiated all human and material preparations for the reconnaissance in the beginning of 2009 . . . . After a few months' hard work and untiring efforts, through internal coordination [we] <u>for the first time broke through the internal network of the Boeing Company in January of 2010</u>. Through investigation of Boeing Company's internal network, we discovered that the Boeing Company's internal network structure is extremely complex. Its border deployment has FW and IPS,

the core network deployment has IDS, and the secret network has [    ] type isolation equipment as anti-invasion security equipment in huge quantities.  Currently, we have discovered in its internal network 18 domains and about 10,000 machines.  Our reconnaissance became extremely cautious because of the highly complex nature of Boeing's internal network.  Through painstaking labor and slow groping, we finally discovered C-17 strategic transport aircraft-related materials stored in the secret network.  Since the secret network is not open 24 hours and is normally physically isolated, it can be connected only when C-17 project related personnel have verified their secret code.  Because we were well-prepared, we obtained in a short time that server's file list and downloaded a small number of documents.  Experts have confirmed that the documents were truly C-17 related and the data scope involved the landing gear, flight control system, and airdrop system, etc.  Experts inside China have a high opinion about them, expressing that the C-17 data were the first ever seen in the country and confirming the documents' value and their unique nature in China.

Scientific/technical support, safely procure, clear achievement.  Since the Boeing Company's internal network structure is highly complex and strictly guarded, successful procurement of C-17 related data required meticulous planning and vigorous technical support.  We were able to deal with them one by one in our work.  (1) We raised the difficulty level of its counter-reconnaissance work to ensure the secure obtainment of intelligence.  From breaking into its internal network to obtaining intelligence, we repeatedly skipped around in its internal network to make it harder to detect reconnaissance, and we also skipped around at suitable times in countries outside the U.S.  In the process of skipping, we were supported by a prodigious quantity of tools, routes, and servers, which also ensured the smooth landing of intelligence data.  (2) We used technology to exit the network securely.  Because breaking into

- 23 -

Boeing's internal network was harder than we imagined, after obtaining intelligence we had to rely on technology to separate and bundle data, change the document formats, etc. Ultimately, we avoided the many internal automatic and manual auditing facilities to transfer data safely and smoothly out of the Boeing Company. (3) We repeatedly skipped around to retreat safely. To ensure obtaining intelligence safely and evading tracking by American law enforcement, we had planned for numerous skip routes in many countries. The routes went through at least three countries, and we ensured one of them did not have friendly relations with the U.S. To safely, smoothly accomplish this mission, we opened five special routes and servers outside the U.S. and shut them down after the mission concluded. (4) We made appropriate investment and reaped enormous achievement. Through our reconnaissance on the C-17 strategic transport aircraft, we obtained files amounting to 65G. Of these, there were 630,000 files and 85,000 file folders, containing the scans of C-17 strategic transport aircraft drawings, revisions, and group signatures, etc. The drawings include the aircraft front, middle, and back; wings; horizontal stabilizer; rudder; and engine pylon. The contents include assembly drawings, parts and spare parts. Some of the drawings contain measurement and allowance, as well as details of different pipelines, electric cable wiring, and equipment installation. Additionally, there were flight tests documents. This set of documents contains detailed contents and the file system is clear and detailed, considered topflight drawings by experts! This project took one year and 2.7 million RMB to execute, showing cost-effectiveness and enormous achievement. This reconnaissance job, because of the . . . sufficient preparations, meticulous planning, has accrued rich experience for our work in future. We are confident and able . . . to complete new mission. . . . August 6, 2012.

[emphasis added]

26. While the report discussed a successful exfiltration by UC1 and UC2, many of the details of the report have not been corroborated. The success and scope of the operation could have been exaggerated. For example, based on information I have received from other FBI agents who learned about Boeing's computer network, I have not discovered any evidence that any classified information has been accessed or exfiltrated. I have also learned that the servers and computers used by Boeing to store the data for the parts and design of the C-17 are in Orange County, California and in other locations, including Dover Air Force Base in Delaware and in McChord Air Force Base in Washington.

27. Nonetheless, there is independent evidence that an exfiltration of C-17 information was successful to some degree. On January 14, 2010, at 09:55:23 +800, UC1 sent SU an e-mail with a subject line of "C-17." In the body of the e-mail, UC1 wrote that he would send the unzip password to SU via text message. Attached to the e-mail was a file titled Desktop 22.rar. What followed this e-mail were a number of e-mails with explicit references to the C-17 in the subject line, in the names of files attached to e-mails, or in the contents of documents attached to e-mails. These e-mails are consistent with the claim in the report that the exfiltration of C-17 data began in January 2010.

28. On January 14, 2010, at 17:22:59, SU sent an e-mail to UC1 with a subject line of "RE: C-17." In the body of the e-mail, SU asked UC1 to give him the original password. Attached to that e-mail was a file titled 22.rar.

29. On January 21, 2010, UC1 sent an e-mail to SU with a subject line of "C-17 _2." Attached to that e-mail was a file titled "C-17_2.rar." In the body of the e-mail, UC1 wrote "The password remains unchanged. Please write me a document about which ones are important, which ones are not important and what they are."

30. On January 22, 2010, UC1 sent SU an e-mail with a subject line of "Re: C-17 _2." In the body of the e-mail, UC1 wrote that the 3.txt was the subdirectory and document of 3-jianhua.txt. UC1 wrote that some directory trees contained random codes. UC1 reminded SU to read the 3.txt.

31. On January 23, 2010, at 21:53:47 +800, SU sent an e-mail to UC1 with a subject line of "RE: C-17 _2." In the body of the e-mail, SU wrote that "judging from its name, the document looks fine." Attached to that e-mail was a .rar file titled "Appendix 3."

32. On January 23, 2010, at 21:57:38 +800, UC1 sent an e-mail to SU with a subject line of "Re: C-17 _2." In the body of the e-mail, UC1 wrote "3.txt is the list of these documents, pay

attention to it! There are some gibberish due to incorrect encoding."

33. On January 26, 2010, SU sent an e-mail to UC1 with a subject line of "Re: C-17 _2" in which SU wrote "There are many picture documents. The useful ones are marked in yellow. Many documents are for application. They should be the computer documents of a person who uses airplane, not the computer documents of a designer."

a. Attached to that e-mail was a Microsoft Word document titled "Appendix 3.docx." That document was 1,467 pages long, and contained what appeared to be a directory structure and list of approximately 50,000 files related to the production, performance, or testing of the C-17. Towards the top of the document there was a directory listing for "Shortcut to electrical-reference-files on [        ]boeing.com.lnk." On March 25, 2014, I learned from another FBI agent that Boeing had confirmed that "[       ]boeing.com.lnk" was an internal Boeing computer server that contained data related to the C-17. Also in the directory listing were approximately 142 files that had been highlighted in yellow, for example: "C17Hangar Requirements 112399.pdf"; "C-17 LOAD TESTINGRev.a.xls"; "C-17 Wiring Failures.ppt"; and what appeared to be a folder of files called "SUPPORT – HYDRAULIC, FIRE SHUT OFF VALVE, OUTBOARD C-

- 27 -

17."  The first page of the 1,467 page directory list is displayed below (with redactions by the FBI).

```
Folder PATH listing for volume Shares L:
Volume serial number is 0006EE50 400A:F04F
Z:.
3    17P1B1172.pdf
3    17P8N1008-535.pdf
3    AC ASGN_Config 4 Aug 09.xls
3    Acronyms.xls
3    [REDACTED]_Retrofit_Configs_19 Feb 2007 - SW.ppt
3    SDS Link.txt
3    Shortcut to electrical-reference-files on [REDACTED]boeing.com.lnk
3
     ????02 -General Vehicle
3  3    AIRCRAFT IDENTIFICATION BY LOT-BLOCK 111709.xls
3  3    Antenna_[REDACTED].pdf
3  3    C-17 Demilitarization Plan (Draft)_Dec2005.msg
3  3    C-17 station guide.pdf
3  3    C-17A-brochure.pdf
3  3    C17 Aircraft names.xls
3  3    C17 TDPG.pdf
3  3    C17Hangar Requirements 112399.pdf
3  3    Critical Safety Item(CSI) Report_Sep2006.pdf
3  3    DEEP FREEZE.pdf
3  3    Design Handbook_Fastener Instll.pdf
3  3    ELT Compatability Test.pdf
3  3    Increased Gross Weight White Paper(may03).doc
3  3    McChord_new aircraft_FY2010.pdf
3  3    OATP List.xls
3  3    Over G Inspections.pdf
3  3    PCR for Brush Cad Plating.msg
3  3    [REDACTED] Jet in Comml Colors.bmp
3  3    RE Safty wire for cannon plugs.msg
3  3    [REDACTED] at March ARB providing APU Training.JPG
3  3    [REDACTED] at March ARB proving APU and Laptop Training.JPG
3  3
3    ????Box Car Seal
3  3      IMG_1278.jpg
3  3      IMG_1279.jpg
3  3      IMG_1280.jpg
3  3      IMG_1281.jpg
3  3      IMG_1282.jpg
3  3      IMG_1283.jpg
3  3      IMG_1284.jpg
3  3      IMG_1285.jpg
3  3
3    ????DEEP FREEZE_Cold Weather Ops & MX Info
3  3      DEEP FREEZE.pdf
```

b.  Based on the communications above, specifically the e-mails where UC1 sought SU's guidance for which C-17 files to acquire, and SU's response that "[t]he useful ones are marked in yellow," I believe UC1 sent SU the C-17 directory he previously obtained from Boeing's network and SU sent the file back to UC1 adding the yellow highlights to identify the "useful" documents that UC1 should steal.

c.  I have also reviewed several of the files received from Boeing on May 30, 2014, that correspond to file names highlighted by SU in the directory file listing that SU e-mailed to UC1. Those documents included a diagram with a label indicating that it contained technical data that is subject to the Arms Export Control Act or the Export Administration Act, PowerPoint presentations with photographs of parts of the C-17, and excel spreadsheets with certain data related to the C-17.

d.  I learned from an FBI agent that file names contained in the directory file listing e-mailed by SU match the names of files on Boeing's network. Specifically, I learned that as of May 30, 2014, of the approximately 50,000 files listed in the 1,467-page directory, 38,886 matched files residing on one of Boeing's C-17 servers, or other servers on Boeing's computer systems. Each of the 38,886 files is unique