(i.e., not a duplicate), and the files were named using various naming conventions, examples of which include the following:

```
1c-17a-2-27jg-30-1.pdf
207200E34P03-317--a.pdf[2]
7383-00142 (EGT Harness MIP).ppt
C17 SDR Briefing.ppt
1780001.pdf
PL1B244172330001-.pdf
SRR-03 C17 Reqmts Use New.PPT
TC1B2441VF7254I00.pdf
```

34. On February 3, 2010, SU sent UC1 an e-mail attaching a file titled "document," which was a .rar file. The listing of the contents of the compressed .rar file contained a word document that included the characters "C-17" along with other Chinese characters.

35. On February 5, 2010, SU sent UC1 an e-mail attaching a file titled "System 20100206.rar." Compressed within the .rar file was a Microsoft Word Document titled "C-17Ïµͳ20100206.docx."

36. On February 7, 2010, SU sent UC1 an e-mail attaching a file titled "System 20100207.rar." Compressed within the .rar file was a Microsoft Word document also called "C-17Ïµͳ20100206.docx," the same name as the compressed file attached to SU's February 5, 2010 e-mail.

37. On March 2, 2010, at 10:40:57 +800, UC1 sent SU an e-mail asking about a "CAMAPROD." SU replied that he was not

---

[2]   Over 5,000 of the files follow this format.

sure. UC1 wrote another e-mail that same day to SU and wrote "17 Keywords" in Chinese in the body of the e-mail.

38. On March 2, 2010, at 12:48:56 +800, UC1 sent an e-mail to SU with a subject line of "17." In the body of the e-mail, UC1 wrote "17's LIST. Read carefully." Attached to that e-mail was an attachment titled "17.rar."

39. On March 3, 2010, SU sent an e-mail back to UC1. Attached to that e-mail was an attachment, also titled "17.rar." The .rar file contained 11 .txt files, whose file names are 17/1.txt through 17/10.txt and an additional file titled 17/tools.txt.

40. On March 4, 2010, UC1 sent SU an e-mail attaching a .rar file, which file name translates to "Blueprint.rar." Based on the subject line and the timing of this e-mail and others sent in the same period of time, this may relate either to the C-17 or to a different project about which they also e-mailed during this period of time.

41. On March 20, 2010, UC1 wrote an e-mail to SU with a subject line of "View picture." In the body of the e-mail, UC1 wrote "Haha." Attached to the e-mail was an image titled C-17.jpg with a list of files. That attachment, which appears below this paragraph, is an image of a directory listing referencing the following files, whose names were partially translated from Chinese to English. All but the last one

contained C-17 in their title: 0-25-113-c17 Key alloy and metal parts list manual.pdf; 1c-17a-1-2 Task system manual.pdf; 1c-17a-2-12jg-24-1 Generator manual.pdf; 1c-17a-2-12jg-29-4 Hydraulic system manual.pdf; 1c-17a-2-47jg-20-1 Inertia gas system manual.pdf; 1c-17a-4-56 Cockpit glass manual.pdf; 33d7-50-1592-2 Fuel test computer.pdf. On the same day, SU replied "Got it." Although these exact file names did not appear in the Appendix 3.docx--the 1,467 page directory SU highlighted and sent back to UC1 on January 26, 2010--I recognize "1c-17a-1," "1c-17a-2," and "1c-17a-4" as a naming convention used internally by Boeing to name many of its C-17-related files. The fact that the files discussed above and depicted below are not included in the Appendix 3.docx indicates that UC1, UC2 and SU's intrusion into Boeing went beyond the 50,000 file names listed in the Appendix 3.docx document. Furthermore, the fact that these file names contain the English characters used commonly in Boeing's naming convention followed by Chinese characters suggests that they were likely saved by UC1 somewhere other than Boeing's network. None of the file names from Boeing's C-17 computers that I have seen to date in this investigation have any Chinese characters in them.

      00-25-113-c17关键合金和金属零件清单手册.pdf
      1c-17a-1-2任务系统手册.pdf
      1c-17a-2-12jg-24-1发电机手册.pdf
      1c-17a-2-12jg-29-4液压系统手册.pdf
      1c-17a-2-47jg-20-1惰性气体系统手册.pdf
      1c-17a-4-56座舱玻璃手册.pdf
      33d7-50-1592-2油量测试计算机.pdf

42. UC1 used the same Gmail address to send and receive all of the e-mails with SU that referred to the C-17 set forth above in the preceding paragraphs. UC1 also used this same Gmail address to send UC2 the report on the completed intrusion described in paragraph 25.

43. On December 28, 2010, UC1 sent an e-mail to UC2 attaching a report. The report stated that the objective had been to acquire U.S. military technology, that it had done so successfully, and that those involved had established hop points in the United States, France, Japan, and Hong Kong.

44. The report stated that those involved had received funding in the amount of 2.2 million RMB to build up its team and infrastructure, to construct positions outside the border, and to purchase software and hardware. The report noted, however, that the actual expenditure had been 6.8 million RMB, and that the gap of 4.6 million RMB had been covered by a loan. This, the report stated, "has caused significant special project C-17 to miss the best opportunity." The report noted that for

2011, "[t]he C-17 Special Project funds will be approximately 3.5 million Renminbi."

45. Certain aspects of the intrusion described in paragraph 25 correspond to information I have learned about Boeing's network, but because of the complexity of the network's architecture, the review is still ongoing. As noted above, although certain aspects of the e-mail described in paragraph 25 are consistent with the network architecture employed by Boeing, other aspects are not. Nonetheless, based on the other contemporaneous e-mails sent at the time the intrusion was taking place, I believe that SU, UC1, and UC2 obtained unauthorized access to Boeing's network and obtained C-17 information from it.

46. The e-mails cited above regarding the C-17 intrusion occurred between January 14, 2010 and March 20, 2010. Based on copies of SU's passport and identifying documents obtained pursuant to a border search of SU and based upon my review of a database that records border-crossings across the U.S. border, I learned that SU was in the United States for part of this period. Specifically, SU flew from the PRC to the United States on January 13, 2010; then flew from the United States to the PRC on January 24, 2010; then flew from the PRC to the United States on February 11, 2010; then flew from the United States to the PRC on February 21, 2010; and then flew from the PRC to the

United States on May 26, 2010. These records showed when SU came in or out of the United States during that period of time, but did not show where else he traveled inside or outside of the United States.

### G. Acquisition of Data for Profit or Economic Gain

47. In addition to e-mails about the content they were accessing and obtaining, SU and UC1 also e-mailed about selling C-17 data. On March 30, 2010, UC1 e-mailed SU and asked if SU had any good news. Then on April 5, 2010, at 9:58, UC1 sent an e-mail to SU with the subject "…". In the e-mail UC1 asked SU "How about giving you the sample of 17?" The e-mail included within its body UC1's March 20, 2010, e-mail to SU where UC1 attached the jpeg of the C-17 files (paragraph 41). Based on this e-mail and the following e-mails, I believe that UC1 was asking SU if it would be helpful to the sales and negotiation process if UC1 provided SU a C-17 document as a sample of the data they had exfiltrated.

48. On April 5, 2010, 10:52, SU sent a reply e-mail to UC1 stating "I understand that it's very urgent for you. It's not that easy to sell the information. If money is collected for the sample of 17, it won't be easy to collect your big money that would follow. Also, it's a long process to apply for the expenses."

49. On April 5, 2010, at 11:30, UC1 replied to SU by e-mail with the subject "Re: Reply: ..." In the body of the e-mail UC1 wrote "It's putting pressure on you, not selling for money. It's just a bargaining chip." I believe that in this e-mail UC1 was explaining that the sample document he referred to earlier was not itself intended to be for sale, but rather to be a bargaining chip to advance the overall negotiation and sale.

50. Thirteen minutes later, at 11:43, UC1 sent a new e-mail to SU with the subject "Thanks a lot." In the body of the e-mail UC1 wrote "OK, that is fine. Thanks a lot." This e-mail also contained in its body UC1's March 20, 2010, e-mail to SU where UC1 attached the jpeg picture file listing C-17 .pdf files.

51. This e-mail exchange shows that both SU and UC1 were seeking the "big money" that would result from selling the information they had acquired.

52. This discussion of value is consistent with other e-mails sent in February and March 2010, in which SU wrote to UC1, referring to a document related to another identified U.S. aircraft and noting that "[t]he value is decent. In China, this information is what the [identified Chinese aircraft corporation] needs. They are too stingy!" Based on this exchange, I believe that SU and UC1 were selling information they obtained to various customers, including PRC aircraft

corporations. This e-mail shows that SU and UC1 were seeking information that they could match to buyers or customers willing to pay a significant price for the information.

53. I have reviewed open source materials that described the corporation identified above as a PRC state-owned aircraft company.

54. Previously, on March 9, 2010, UC1 sent an e-mail to SU with a subject line "My account number." UC1 wrote "China Merchants Bank Shenzhen: [XXXX XXXX XXXX]4611 [UC1]; Industrial and Commercial Bank of China Shenzhen: [XXXX XXXX XXXX XXX]5369 [UC1]."

55. This evidence suggests that SU and UC1 were obtaining the information at least in part for commercial advantage and private financial gain. Given their own estimation of the value of the information obtained related to the C-17 alone (i.e., the "big money"), and my review of the data obtained from multiple military projects, I believe the value of the information they obtained is well in excess of $5,000.

H.   Other Military Cargo Aircraft Data

56. As set forth above, I believe that UC1 sent SU file directory listings showing files and folders residing on Boeing's computer networks, and SU then sent back to UC1 a highlighted version of the file directory listing indicating the files of interest for UC1 to exfiltrate. As set forth below, I

believe that SU and UC1 similarly exfiltrated data from a competitor of Boeing regarding another military transport plane, which shows that one of their objectives was to acquire data related to military cargo aircraft.

57. On August 27, 2010, SU sent an e-mail with several attachments from his subin@lode-tech.com account to UC1. Both the subject of the e-mail and the .rar attached to it made reference to what I believe was the numerical model of a military cargo aircraft, and the .rar attached was a file with seven compressed files inside.

58. On October 24, 2010, SU sent an e-mail with several attachments from his subin@lode-tech.com account to UC1. The subject of the e-mail was "Document." The body of the e-mail stated "it remains the same." Attached to the e-mail was a .rar file with reference to the same numerical model. Compressed within that .rar file were five Microsoft Word documents, each of which contained computer file directory listings related to several military and civilian aircraft produced by a non-U.S. aircraft manufacturer. The metadata associated with each of these files identified "Stephen Subin" as the author.

59. In addition to file names related to military aircraft, the directories also included hundreds of file names related to commercial passenger aircraft, including four

specific models. There were over 200 files related to one such civilian aircraft alone.

60. One of the file directories attached to SU's October 24, 2010, e-mail was more than 6,000 pages long. Twenty-two folders and files were highlighted in yellow in this directory, in the same manner that SU had highlighted files of interest in the Boeing C-17 directory. One of these 22 highlighted items was a folder whose name made explicit reference to the model of the military cargo aircraft. That folder alone contained more than 2,000 individual files.

61. Another file directory attached to the e-mail was 137 pages long and contained another 17 yellow highlighted folders and files, covering more than 87 files related to the military cargo aircraft. Several of the yellow highlighted file names included Chinese language added to the end of the file name. Because SU is identified by metadata as the author of the document and SU e-mailed the attachment to UC1, I believe SU most likely added the Chinese language. One of the highlighted file names with added Chinese referred to "outlook" in the file name, which file was depicted in a file directory page. Based on my training and experience I know that a ".pst" file is a Microsoft Outlook Data File format which stores a user's e-mail messages. The English translation of the included Chinese is

"This is an outlook document, if this is from the chief engineer then we will do it."

62. As described above, UC1 and SU followed the same pattern of behavior in their scheme to exfiltrate data related to both the C-17 and this military cargo aircraft. Specifically, after UC1 e-mailed .rar files that I believe were likely file directory listings to SU, SU then e-mailed back to UC1 the uncompressed file directory listings with yellow highlighting on portions of them. I believe SU highlighted in yellow the folders and files that SU believed had value, and sent the directories back to UC1 to exfiltrate the highlighted items from the manufacturer's computer network.

I. Exfiltration of F-22 Information

63. Over the course of the investigation, I have also seen that SU and UC1 have targeted other military technology, including certain technology that relates to the F-22.

64. On April 4, 2010, at 21:42 UC1 sent an e-mail to SU with a subject line of "22." The body of the e-mail read "22." Attached to that document was a file titled "22.rar." Based on a review of e-mails exchanged by UC1 and SU that follow chronologically after this e-mail, and which are discussed below, I believe this .rar file related to the F-22 fighter aircraft.

- 40 -

65. Based on a review of websites belonging to companies that work on parts of the F-22, I know the F-22 "Raptor" was designed as a supersonic, super-maneuverable, stealthed air superiority fighter. According to one web site, the F-22 is the world's premier 5th generation fighter.

66. On April 4, 2010, at 22:33, SU responded to UC1. The subject of that e-mail was "RE: 22." In it, SU wrote that "[i]t's still the information related to the mount." Based on my review of this e-mail, the image attached to it, and the e-mails that UC1 sent SU immediately afterwards, I believe the "mount" SU is referring to is the particular F-22 component ("Component B") that is the subject of the presentation described below.

67. On April 4, 2010, at 22:42, SU sent an e-mail to UC1 again and wrote: "Take a look at the document" and then identified a specific PowerPoint file name, folder, and a subfolder with Component B's name. Based on the pattern of UC1 sending SU file directory listings and SU identifying files of interest for UC1 to obtain, I believe the 22.rar files UC1 sent SU likely contained a directory of files related to the F-22, and that the Component B file SU asked UC1 to look at was likely one of many files listed in that file directory. This also shows that SU was telling UC1 which files to access and obtain.

68. On April 4, 2010, at 22:53 UC1 responded by e-mail to SU and included an attachment. The subject line of the e-mail was "Re: Reply: 22." and the attachment was called IMG_0367.JPG. The attachment was a photo of a PowerPoint presentation slide displayed on a computer monitor. The slide was a technical schematic and at the bottom of the slide was written "[Identified Company] Proprietary Information Source Selection Sensitive. This Data is covered by IATR [sic] 22 CFR 120-130." (This means that it is a violation of AECA to export this information from the United States or to disclose it to foreign nationals without a license.)

69. Following this e-mail, UC1 sent SU four more e-mails in quick succession. He sent these e-mails to SU on April 4, 2010, at 22:55, 22:57, 23:06 and 23:12. Each e-mail had the subject line "Re: Reply: 22" and contained a photo attachment identified as IMG_0368.JPG, IMG_0370.JPG, IMG_0369.JPG, and IMG_0372.JPG, respectively.

70. IMG_0369.JPG, shown redacted below, is one of the photos of a computer monitor showing a PowerPoint slide. In this photo part of the task bar at the bottom of the computer screen can be seen. A folder labeled with the name of Component B is visible, as are a series of Chinese characters that say "Mandarin China." I believe the photos were likely taken by UC1 using his mobile phone in front of his computer monitor while he

was accessing the presentation. Based on a review of each of these images, I believe the PowerPoint slides are part of the Component B presentation SU asked UC1 to look at by providing the file path, and that UC1 had possession of the entire PowerPoint presentation. (The image below has had the content redacted by the FBI.)



71. As noted above in paragraph 21, the F-22 is on the list of compromised projects that UC1 and UC2 claimed they had obtained.

72. I have met with representatives of the U.S. company identified in the screenshots, and I have received from them a PowerPoint presentation with content that matches each of the screenshots from the PowerPoint referred to above. The document was dated May 30, 2014, the date on which I received it, and the date appeared to be automatically generated and displayed on the slide. This would be consistent with the date of April 4, 2010 appearing on the slides captured in the screenshots sent on April 4, 2010. Each of the pages captured in the screenshots sent to SU by UC1 matched a page in the document I obtained from the U.S. company.

J.   Other Technology Acquired

73. Through my review of e-mails between SU, UC1, and UC2, I have learned that they were involved in acquiring information related to multiple other U.S. military projects, two examples of which are set forth below.

74. First, between November 2 and November 10, 2011, SU sent UC1 and UC2 three e-mails each with an attached report that discussed the PRC's acquisition of data related to an identified advanced United States military project (which I refer to herein as "Project A") and the value of that material. Based on the duplication of content in the reports and because each successive report sent by SU contained additional detail, I believe SU, UC1, and UC2 were preparing and editing the report.

The metadata associated with the first two reports lists one person's name, while the metadata of the most complete and final version of the report listed "Stephensu" as the author. As noted above, SU is also known as Stephen Subin and Stephen Su.

75. The 11-page final report was sent from SU to UC1 and UC2 on November 10, 2011, at 23:48:40 GMT. It included 14 graphics depicting diagrams, data tables, calculations and schematics related to Project A. These graphics are in English and relate to Project A. The report described in Chinese the value and importance of the underlying documents from which the graphics had been taken. The report made reference to obtaining U.S. military data related to the project, including blueprints and testing data. The report also claimed that the information would "allow us to rapidly catch up with U.S. levels," that the information was protected by U.S. export restrictions, and that the information would allow them to "stand easily on the giant's shoulders." While a couple of the slides incorporated into SU's report appear to be publicly available, I have spoken to two U.S. government entities with oversight over Project A, and they have told me that at least nine of the slides or images are not publicly available information about Project A.

76. Second, on May 3, 2012, SU sent UC1 an e-mail with the translated subject line "Plan." Attached to that e-mail was a 120-page Microsoft Word document containing the F-35 Joint

Strike Fighter Flight Test Plan. That document laid out the flight test protocol for the F-35, which, according to open-source materials I have reviewed, is the world's most advanced multi-role fighter, combining radar-evading stealth, supersonic speed, and extreme agility with the most powerful and comprehensive integrated sensor package of any fighter aircraft in history. I also learned that the F-35 was developed by a consortium of defense contractors from the United States and eight other countries at an estimated cost of $11 billion.

77. The "Flight Test Plan" is an English-language document that has Chinese translation incorporated throughout. The metadata of the document identifies an engineer at a U.S. company as the original author and "Subin" as the last person to save the document.

78. Based on the pattern of communication I have observed between SU and UC1 and that is documented in this complaint, I believe UC1 obtained this document and sent it to SU. SU in turn added the Chinese language to the document and sent it back to UC1. The first page of the document is shown below.



79. I visited one of the U.S. companies that works on the F-35 and I viewed the first page of a document that I was told by an employee was an earlier version of this same document. Subsequently, I spoke on the telephone with another employee who confirmed with one of the people believed to be an author of the document that it was a version of a document used in connection

with the F-35 and that it was not distributed publicly. That company also said it had conducted a thorough investigation and found no evidence that a version of this document had been obtained from its computer systems.

## IV.

### SEALING REQUEST

80. The criminal investigation into the activities of the subject of this affidavit is continuing. Disclosure of the contents of this affidavit would seriously impede the investigation by revealing details of the government's investigation and evidence gathered in connection herewith. It would alert the subjects of the investigation to the fact that the government had obtained their e-mails, which would cause them to stop using those e-mail accounts. It would also be likely to cause them to flee and destroy any evidence of these events, or potentially manufacture evidence that concealed the true nature of their conduct or that indicated that other persons were responsible. Further, the subjects of the investigation would be able to learn the extent of the government's investigation as set forth herein. Accordingly, I request that the Court issue an order sealing this affidavit, the complaint, and arrest warrant until further order of this Court.

## V.

## CONCLUSION

81. Based on the facts set forth above, I believe that there is probable cause to believe that SU BIN has committed a violation of Title 18, United States Code, Section 1030(a)(2)(C) (Unauthorized Access of a Computer and Obtaining Information), and a violation of Title 18, United States Code, Section 1030(b) by conspiring with UC1 and UC2 to violate both Title 18, United States Code, Sections 1030(a)(2)(C) and Section 1030(a)(4) (Accessing a Computer to Defraud and Obtain Value).

/s/
_____
NOEL A. NEEMAN
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me
on this 27TH day of June, 2014

RALPH ZAREFSKY
_____
HONORABLE RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE